## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOSEPH VASPASIANO, | : | Case No. 3:19-CV-00675 (OAW) |
|    *Plaintiff*, | : | |
| v. | : | |
| | : | |
| METRO-NORTH RAILROAD CO. | : | |
|    *Defendants*. | : | |
| | : | OCTOBER 28, 2022 |

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

American workers have braved horribly dangerous working conditions throughout our nation's history, in occupations such as sanitation, mining, and other jobs in the air, on land, and at sea, all to make an honest living.[1]  Railroad employees are no exception. In order to help them hold their employers accountable for negligence, Congress enacted legislation allowing railroad workers to bring suit under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51 *et seq*.  *See Goodrich v. Long Island Rail Rd. Co.*, 654 F.3d 190, 194 (2d Cir. 2011) (noting that FELA is Congress's response to "the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year") (quoting *Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532, 542 (1994)).

In the present case, Plaintiff Joseph Vaspasiano ("Plaintiff") brings this FELA action against Defendant Metro-North Commuter Railroad Company ("Defendant"  or "Metro-North") for serious injuries he suffered while replacing a guardrail on a railroad

---

[1]  *See* OSHA Data & Statistics, U.S. Dep't of Labor, https://www.osha.gov/data/commonstats (noting approximately 38 daily worker deaths in 1970 as compared to 13 in 2020); *see also* Chart of Number and rate of nonfatal work injuries and illnesses in private industries (2020), U.S. Bureau of Labor Statistics, https://www.bls.gov/charts/injuries-and-illnesses/number-and-rate-of-nonfatal-work-injuries-and-illnesses-by-industry.htm

bridge operated by Metro-North in Westport, Connecticut.  Metro-North has moved for summary judgment.  ECF No. 25.  Based on the reasons stated herein, Metro-North's motion for summary judgment hereby is **<u>GRANTED.</u>**

## I.   BACKGROUND

The following facts are taken primarily from the parties' Local Rule 56(a) Statements of Undisputed Facts.  *See* Metro-North's L.R. 56(a)(1) Stmt., ECF No. 26 ("Def.'s Stmt."); Pl's L.R. 56(a)(2) Stmt., ECF No. 34 ("Pl.'s Stmt.").  Additional facts are incorporated as necessary, and to the extent there exists in the record support for such facts.  All ambiguities are construed in Plaintiff's favor.  All statements of fact are undisputed, unless indicated otherwise:

Plaintiff became an employee of Metro-North on September 6, 2017.  Vaspasiano Dep. 11:10–12, ECF No. 33-1.  As a Metro-North Trackman, Plaintiff would perform track work on Metro-North's railroad bridges.  *See id.* at 25:6–22; Def.'s Stmt. at ¶ 3.  In November 2017, Plaintiff began working on the Saugatuck River Bridge ("Saugatuck Bridge")—a railroad drawbridge located in Westport, Connecticut.  Def.'s Stmt. at ¶ 1; Vaspasiano Dep. 26:24–27:4.

The Saugatuck Bridge is an open deck railroad drawbridge owned by the Connecticut Department of Transportation ("CT DOT"). [2]  Def.'s Stmt. at ¶ 2.  The bridge

---

[2]     Plaintiff does not deny that the Saugatuck Bridge is owned by CT DOT.  Instead, Plaintiff objects to Metro-North's submission of CT DOT's Railroad Bridge Management Program ("RBMP").  Pl.'s Stmt. at ¶ 1; RBMP, ECF No. 26-1.  The RBMP establishes an inventory of railroad bridges owned by CT DOT, including the Saugatuck Bridge.  *Id.* at Appendix 3.  Plaintiff argues that the RBMP is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence.  The objection is overruled.  The RBMP is a public record which establishes safety standards, inspection and reporting procedures, and outlines numerous other activities of the CT DOT's Office of Rail.  As a public record, the RBMP is admissible as an exception to the rule against hearsay.  *See* Fed. R. Evid. 803(8) (The following are not excluded by the rule against hearsay . . . (8) Public Records. A record or statement of a public office if: (A) it sets out: (i) the office's activities[.]").

contains four railroad tracks: Track One, Track Two, Track Three, and Track Four. Bourt Dep. 16:9–17:13. Each of the railroad tracks is composed of wooden blocks of timber (commonly known as "ties" or "bridge ties") which are secured directly to the structure of the bridge. Pl.'s Photographs of Gaps, ECF No. 26-5; RBMP at 6.1.2, ECF No. 26-2. The ties on Track 2 are spaced apart by approximately seven to eight and one-half inches, creating a gap between each of the ties. Pl.'s Photographs of Gaps, ECF No. 26-5; Pl.'s Stmt. at ¶ 13. The tie gaps expose the water approximately ten to thirty feet below the bridge. Vaspasiano Dep. 82:7–13. When a train operates on the Saugatuck Bridge, it moves along a "running rail," (two parallel rails spanning the length of the bridge, which are secured by spikes onto the wooden bridge ties). *See* Best Dep. 60:22–61:4, ECF No. 33-26. The portion of rail that runs across the opening of the drawbridge is known as the "miter rail." Bourt Dep. 22:18–19, ECF No. 33-15. The Saugatuck Bridge also contains a guardrail on Track Two. Vaspasiano Dep. 130:14–20. The guardrail is located in between the parallel running rails, and is designed to prevent a train from going off the bridge in the event that the train derails (i.e., if the train becomes separated from the running rail). Best Dep. 60:22–61:4. Like the running rail, the guardrail is secured directly to the bridge ties with spikes. *See* Def.'s Stmt. at ¶ 5.

In 2017, Metro-North began work on the state's plans to renew the Saugatuck Bridge.[3] The project involved replacing all bridge ties, upgrading the miter rails, and replacing the guardrails. Bourt Dep. 22:9–23, ECF No. 33-15; Best Dep. 15:3–8, ECF No. 33-26. Plaintiff was assigned to work on the Saugatuck Bridge project for at least

---

[3]     As the owner of the bridge, CT DOT has its railroad bridge engineers and supervisors review bridge inspection reports and determine if the bridge needs to be evaluated for potential repairs and modifications. RBMP at p. 5-3. The repair plans are then provided to Metro-North (the bridge operator) for execution. *Id.* at p. 6-1.

one to two days per week between November 2017 and March 2018.  Def.'s Stmt. at ¶ 4.

Plaintiff's assignment was to remove and to replace the guardrail.  Vaspasiano Dep.

44:12–13.  The act of replacing guardrail is a multi-step process.  Def.'s Stmt. at ¶ 5.  First,

Plaintiff would use a pry bar to individually remove each of the spikes on the inside of the

guardrail.  Vaspasiano Dep. 44:23–45:18.  To remove the spikes, Plaintiff would need to

stand on a bridge tie adjacent to the one supporting his pry bar.  Id. at 48:4–49:7.  Both

feet would be on the same nearby bridge tie, perpendicular to the guardrail.  Id.  After

using the pry bar to remove the inside spikes, Plaintiff would loosen the spikes on the

outside of the guardrail.  Id. at 52:18–21.  At that point, the guardrail would be removed

via a crane, id. at 54:18–55:5, and Plaintiff would inspect the area underneath the

guardrail to ensure that it has not been damaged.  Id. at 57:17–22.  After removing the

guardrail and inspecting the area, the next step is to tap down the previously-loosened

spikes on the outside of the guardrail, id. at 58:6–10, using a spike maul.  Id. at 58:11–

13.  When tapping down the spikes, Plaintiff could position his feet for stability so that

each foot was on a different bridge tie.  Id. at 60:9–25.

     After removing the guardrail and tapping down the spikes, the replacement

guardrail would be brought in and lowered by a crane.  Vaspasiano Dep. 61:12–17.

Employees would then go back to the spikes that had been tapped down, lift them up,

slide the guardrail underneath, and use the spike maul to tap down the spikes so as to

secure the new guardrail.  Id. at 64:22–65:7.  The process would then be repeated in

order to remove and to replace each section of guardrail.  Id. at 65:18–23.

     On March 6, 2018, Plaintiff reported for work at the Saugatuck Bridge.  Def.'s Stmt.

at ¶ 3.  As usual, he began replacing guardrail.  Id.  While Plaintiff was in the process of

tapping down spikes, a train passed on an adjacent track.  Def.'s Stmt. at ¶ 9.  Consistent with his training, Plaintiff stopped working and waved to acknowledge the train as it passed.  *Id.*  At the time, Plaintiff was standing with both feet on one wooden tie.  Vaspasiano Dep. 84:7–8.  After the train passed, Plaintiff prepared to move his right foot, *id. at* 89:9, to walk to another tie that was perhaps two to five ties away, *id.* at 92:18–20, 24, when his foot hit the spike he had just tapped down and secured, *id.* at 86:2–7, and which was located on the exact tie upon which he had been standing, *id.* at 88:25–89:4.  Plaintiff lost his balance.  *Id.* at 93:10–12.  He brought his right foot down to prevent himself from falling, but his foot slipped through the gap between the two ties.  Def.'s Stmt. at ¶ 12.  His right knee struck the edge of the tie and his left knee landed flat on the same tie.  *Id.*  Plaintiff suffered a 4-centimeter laceration on his right knee that required sixteen staples in the emergency room.  ER Report, ECF No. 33-4.  He also underwent two knee repair surgeries in the months following the accident.  Reports, ECF Nos. 33-5, 33-6.

In the past, other Metro-North employees have slipped into the gaps on bridge ties while performing work on railroad bridges.[4]  Pl.'s Stmt. at ¶ 2.  In 2013, a Metro-North employee, Frank Venuti ("Mr. Venuti"), filed a complaint in federal court claiming that he had slipped off a tie into a gap on the Saugatuck Bridge while performing a test on a circuit controller box.  Pl.'s Stmt. at ¶ 4; Venuti Compl., ECF No. 33-16 at ¶ 9.  Defendant Metro-North was aware of the claim.  Def.'s Response to Pl.'s Stmt. at ¶ 4.  Another employee, Miguel Ayala, also was injured when his foot slipped into the gap between ties

---

[4]     Metro-North objects to Plaintiff's submission of prior accident evidence. *See* Pl.'s Stmt. at p. 2, ¶¶ 4–6, ECF No. 34; Def.'s Response to Pl.'s Stmt. at ¶¶ 4–6, ECF No. 36. As explained in a later portion of this opinion, the court deems Plaintiff's evidence of prior accidents inadmissible.

on a different Metro-North bridge.  *Id.* at ¶ 5; Bourt Dep. 20:14–21:9.  Mr. Ayala's accident occurred some time before Plaintiff's accident, on the Devon Bridge in Milford.  Def's Response to Pl.'s Stmt. at ¶ 5; Bourt Dep. 12:9–10.  The record does not indicate the type of work in which Mr. Ayala was engaged at the time of his accident.

Where necessary, Metro-North is capable of installing 20-inch wide material inside the gauge of the tracks for workers to walk upon in lieu of walking across the bridge ties.  Pl.'s Stmt. at ¶ 9.  Indeed, at different phases of bridge projects, Metro-North has erected temporary walkways when there are timbers missing, or where timbers have been removed for replacement across an expansive area of the tracks.  *Id.* at ¶ 10.  Other fall protection measures implemented by Metro-North include temporary plywood boards and yellow grating to prevent employees from falling off a bridge onto the surface below.  *Id.* at ¶ 12.  For example, on the Saugatuck Bridge, Metro-North placed a plywood board over the opening that existed between Track 2 and Track 4, to limit the hazard of someone falling in the gap between the two tracks.  *Id.* at ¶¶ 12–13; Bourt Dep. 76:8–78:4.  The parties disagree as to whether fall protection measures between the rails of a track (i.e., a walkway installed on the inside gauge of the rail) would be feasible on a track still in operation, even if Metro-North is capable of installing such measures.

Metro-North performs Job Safety Analyses ("JSAs") to determine hazards and to develop controls for those hazards.  Metro-North Policy at 25, ECF No. 33-10.  The typical steps for conducting a JSA are as follows: (1) selecting the job to be analyzed; (2) separating the job into basic steps; (3) identifying the hazards within each step; (4) revising the JSA periodically and after any accidents or "near miss" occurrences; and (5) identifying a means to control the hazard.  *Id.*  A JSA is not conducted for every

conceivable task performed by a Metro-North employee.   Instead, a JSA is performed when there is a new tool or technology in the workplace, a change in regulations requiring a new job procedure, or a trend of accidents occurring.  Streany Dep. 17:17–18:6; 22:24–23:5.  Metro-North has not performed a JSA to evaluate the hazards for work performed on railroad bridges including replacing or repairing running rail, guardrail, timbers, or ties. *Id.* at 9:15–10:3.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate if the moving party can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists."  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (citations omitted).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.*  The court also must disregard all evidence favorable to the moving party that the jury is not required to believe.  *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012).  "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate."  *Id.* (citing Fed. R. Civ. P. 56(e) Advisory Committee Note (1963)).

A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  *Robinson v. Concentra Health Servs.*, 781

F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).  "[A] party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (quoting *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986)).  Instead, the party opposing summary judgment must set forth in their response "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 243.  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Brown*, 654 F.3d at 358 (internal quotation marks omitted).

At the summary judgment stage, the judge's function is "not to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue" of material fact for trial.  *Anderson*., 477 U.S. at 249.  The substantive law will identify which facts are material, and only disputes over facts that might affect the outcome of the suit under the governing law will preclude the entry of summary judgment.  *Id.* at 248. When reasonable persons, applying the proper legal standards, could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury. *See Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir. 2000).

A case brought under FELA "must not be dismissed at the summary judgment phase unless there is absolutely no reasonable basis for a jury to find for the plaintiff." *Gadsden v. Port Authority Trans–Hudson Corp.,* 140 F.3d 207, 209 (2d Cir.1998).  "The right of the jury to pass on factual issues must be liberally construed." *Williams v. Long Island R.R. Co.*, 196 F.3d 402, 407 (2d Cir. 1999) (internal quotations

omitted). Thus, "[o]nly in instances where reasonable jurors could reach only one conclusion may the court take the determination from the jury and decide the question as a matter of law." *Gallose v. Long Island R. Co.*, 878 F.2d 80, 85 (2d Cir. 1989).

## III.   INADMISSIBILITY OF PRIOR ACCIDENTS

On a motion for summary judgment, a district court only may rely on material that would be admissible at trial. *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir. 1994). Evidence shall be admissible only to the extent it is relevant and that it carries probative value not substantially outweighed by a danger of being unfairly prejudicial, likely to confuse the issues, or likely to mislead the jury. *See* Fed. R. Evid. 402, 403. Evidence of prior similar accidents is "unquestionably relevant," as it does tend to make it more likely that a defendant was aware of the risks in question. *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 474 (2d Cir. 1995) (reversing district court's refusal to compel evidence regarding accidents similar to that of the plaintiff's because "evidence of such incidents would unquestionably be relevant, if not central, to [the plaintiff's] case"); *Hopkins v. Nat'l R.R. Passenger Corp.*, No. 08CV2965NGGRML, 2016 WL 8711718, at *19 (E.D.N.Y. Apr. 29, 2016).

Evidence of prior accidents, however, is admissible only if the prior accidents are "substantially similar" to the accident in question. *See Hopkins v. Nat'l R.R. Passenger Corp.*, No. 08CV2965NGGRML, 2013 WL 12363095, at *9 (E.D.N.Y. Feb. 27, 2013) ("As a general matter, evidence of prior accidents is admissible to show a defendant's knowledge of a dangerous condition, but the basic principles of relevancy 'require that the other instances of injuries received should have occurred under substantially similar circumstances.'"); *Schmelzer v. Hilton Hotels Corp.*, No. 1:05-CV-10307 (JFK), 2007 WL

2826628, at *2 (S.D.N.Y. Sept. 24, 2007) (noting the "substantially similar" standard, but also recognizing that "[c]ourts have applied a relaxed standard where the prior accidents are offered only to show that the defendant had notice"); *see also Fortunato v. Ford Motor Co.*, 464 F.2d 962, 968 (2d Cir. 1972) ("Competent evidence of accidents similar to [Plaintiff's] . . . would have been admissible").

In the instant case, Plaintiff references two accidents that preceded his own and that involved Metro-North employees.  Even under the relaxed standard required for the limited purpose of establishing Metro-North's notice of a hazard, the court deems Plaintiff's evidence of prior accidents inadmissible.  The accidents are not  "substantially similar" to Plaintiff's accident, as the record simply lacks adequate detail as to the circumstances of those two prior accidents.

Plaintiff first mentions Miguel Ayala, an employee who injured himself after slipping between ties on a bridge (the Devon Bridge), Pl.'s Opp. at 8; Bourt Dep. 20:14–21:14, different from the bridge where Plaintiff's accident occurred.  Plaintiff provides no information about the size of the gap between the bridge ties in the area of Mr. Ayala's accident that would in any way equate it to the area of Plaintiff's incident.  Instead, Plaintiff curiously mentions that the gaps between the bridge ties on the Saugatuck Bridge (where Plaintiff's accident occurred) were similar to the gaps "on the *Waterbury* Bridge."  Pl.'s Opp. at 8 (emphasis added).  Notably, Mr. Bourt's deposition explains that the Devon Bridge, the site of Mr. Ayala's accident, is in *Milford*, Bourt Dep. 12:9–10, which is some twenty miles away from Waterbury.  Then, in explaining the similarities between the location of Plaintiff's accident and the *Waterbury* Bridge, Plaintiff cites to the deposition of Track Foreman Doug Schneider.  Pl.'s Opp. at 8 (citing to Ex. 20).  Plaintiff fails to

explain the relevance of the comparative gap size as to the bridge ties on the site of Plaintiff's accident and the gaps between ties on a bridge in Waterbury, particularly when Mr. Ayala's accident took place in Milford and Plaintiff's accident occurred in Westport. Furthermore, Plaintiff fails to explain whether the jobs being performed by the employees at the relative times of their accidents bore any similarity whatsoever, other than to mention that the individuals had been "working on railroad bridges" at the time. *Id*. In fact, Plaintiff even fails to establish the *year* of Mr. Ayala's injury. *See* Pl.'s Opp. at 8; Bourt Dep. 20:25–21:1.

In the same paragraph wherein Plaintiff notes the injury to Mr. Ayala, he uses a single sentence to reference an injury to Signal Maintainer Frank Venuti. Pl.'s Opp. at 8. Again, Plaintiff fails to describe how (or whether) Mr. Venuti's work actions were similar to Plaintiff's at the times of their respective accidents; Plaintiff only cites a document that mentions Mr. Venuti was "performing a 65A Test on a Circuit Controller Box", Ex. 16 at 1, ECF No. 33-16; Pl.'s Opp. at 8. In this instance, Plaintiff notes that Mr. Venuti's accident took place in 2010, Pl.'s Opp. at 8, some eight years before Plaintiff's accident. And while Mr. Venuti's accident also took place on the Saugatuck Bridge, Plaintiff does not bother to establish whether the gaps between bridge ties were of a similar width (seven to eight and one-half inches apart) as was the case when Plaintiff slipped on the same bridge several years later. The court cannot make this bold presumption any more than it can presume without evidence that executing a 65A test on a circuit controller box is anything akin to replacing a guardrail (as Plaintiff was doing during his accident).

Indeed, Plaintiff's chief complaint is that the tie gaps on the Saugatuck Bridge were too wide for him to safely perform his work replacing guardrail without a platform. The

mere fact that two other Metro-North employees slipped on bridge ties with unspecified gap widths, while doing work possibly different than Plaintiff's, is insufficient to render those accidents "substantially similar" to Plaintiff's accident.  *See Lidle v. Cirrus Design Corp.*, 505 F. App'x 72, 74 (2d Cir. 2012) ("Whether a prior accident occurred under 'substantially similar' conditions necessarily 'depends upon the underlying theory of the case, and is defined by the particular defect at issue.'").  Without additional information to indicate that the prior accidents occurred under similar conditions, the court cannot conclude that the prior accidents were "substantially similar" to Plaintiff's accident.  *See Higgins v. Metro-North R.R. Co.*, 318 F.3d 422, 427 (2d Cir. 2003) (affirming grant of summary judgment upon district court's determination that three known incidents of unwanted contact did not place Metro-North on adequate notice of employee's likelihood of sexual harassment).  Thus, the minimal probative value of the evidence as relevant is outweighed by the danger of unfair prejudice to Metro-North, and therefore is inadmissible.  The prior accidents will not be considered for purposes of this summary judgment motion.

## IV.   DISCUSSION

Metro-North argues that it is entitled to summary judgment because (a) Plaintiff cannot establish liability under FELA and, (b) even if Plaintiff could establish the requisite elements of the claim, Plaintiff's FELA claim is preempted by the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20106.

### a.   FELA

FELA provides that any railroad engaging in interstate commerce "shall be liable in damages to any person suffering injury while he is employed by such carrier in such

commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier . . . ." 45 U.S.C. § 51. "In FELA actions, the plaintiff must prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation." *Tufariello v. Long Island R. Co.*, 458 F.3d 80, 87 (2d Cir. 2006). "[R]easonable foreseeability of harm is an essential ingredient of [FELA]." *Gallick v. Baltimore & O. R. Co.*, 372 U.S. 108, 117 (1963). The reasonable foreseeability element requires "proof of actual or constructive notice to the employer of the defective condition that caused the injury." *Sinclair v. Long Island R.R.*, 985 F.2d 74, 77 (2d Cir. 1993).

Under FELA, "an employer breaches its duty to provide a safe workplace when it knows or should know of a potential hazard in the workplace, yet fails to exercise reasonable care to inform and protect its employees." *Gallose v. Long Island R. Co.*, 878 F.2d 80, 84–85 (2d Cir. 1989). To be clear, a railroad does not have a duty to eliminate all workplace dangers by providing the "safest possible workplace," but only the duty of exercising reasonable care in providing a reasonably safe working environment. *See Ezell v. BNSF Ry Co.*, 949 F.3d 1274, 1282 (10th Cir. 2020) (declining to expand FELA's safe-workplace standard to require that railroads provide the safest alternative available); *Van Gorder v. Grand Trunk W. R.R.*, 509 F.3d 265, 269 (6th Cir. 2007) (noting that railroad has no duty to eliminate all workplace dangers); *Darrough v. CSX Transportation Inc.*, 321 F.3d 674, 676 (7th Cir. 2003) (clarifying that issue in FELA claim is whether railroad exercised reasonable care in creating a reasonably safe working environment, not whether that working environment could have been safer); *see also Hane v. Nat'l R.R. Passenger Corp.*, 110 F.3d 573, 574 (8th Cir. 1997) (recognizing as a long-standing and

accurate statement of law that a railroad is not required to furnish the "latest, best and safest tools" to its employees).

A plaintiff's burden "in making a showing of causation and negligence is lighter under FELA than it would be at common law because the theory of FELA is that where the employer's conduct falls short of the high standard required of him by the Act and his fault, in whole or in part, causes injury, liability ensues." *Id.* Thus, "juries have more latitude to infer negligence than at common law, such that the question can rarely be taken from them and decided by the court as a matter of law." *Coale v. Metro-North Commuter R.R. Co.*, 621 F. App'x 13, 14 (2d Cir. July 13, 2015). However, FELA does not make an employer strictly liable for workplace injuries. *Sinclair v. Long Island R.R.*, 985 F.2d 74, 76-77 (2d Cir. 1993). A plaintiff still must offer at least "some evidence that would support a finding of negligence." *Id.*

Plaintiff argues that Metro-North knew or reasonably should have known that working and walking over seven- to eight-and-one-half-inch[5] gaps between railroad ties is hazardous in that (1) Defendant is aware of passenger injuries resulting from gaps on train station platforms;  (2) its Track Department supervisor testified that the gaps pose a "constant hazard;" and (3) it has not conducted any safety audits to evaluate hazards for work performed on its railroad bridges. Accordingly, Plaintiff argues that (4) Metro-North could have provided platforms or flat surfaces upon which its employees could have walked and worked, and that it could have trained or instructed employees to install them.

---

[5]    Plaintiff refers to the gaps in the Saugatuck Bridge as ranging from seven to nine inches, but the record indicates that the gap is between seven and eight and one-half inches. *Compare*, Pl.'s Opp. at 8, *with* Photograph of Gap Measurement, ECF No. 33-19. Plaintiff also admits in his statement of undisputed facts that "the distance between timbers at certain locations of the Saugatuck Bridge ranged from 7 inches to 8.5 inches." Pl.'s Stmt. at ¶ 13, ECF No. 34.

1.  <u>Defendant Had Insufficient Notice to Suggest that the Workplace was "Not Reasonably Safe"</u>

Plaintiff submits a 1987 report from the New York Office of the Inspector General (the "OIG Report") which investigates the safety hazards arising from gaps between Metro-North trains and the platforms at its train stations.  OIG Report, ECF No. 33-11. Plaintiff also submits Metro-North records of "gap injuries" suffered by passengers who fell into platform gaps while boarding and deboarding a train.  Gap Injuries, ECF Nos. 33-12; 33-13.  However, neither the OIG Report nor the gap injury records relate to Plaintiff's accident on the Saugatuck Bridge (which instead involved the gap between bridge ties upon the actual railroad tracks).

In this case, Plaintiff admittedly tripped over a spike that he had just secured, causing his leg to slip between bridge ties.  Vaspasiano Dep. 86:2–7, ECF No. 33-1.  This differs markedly from an injury related to the gap between a platform and a train.  Gaps between bridge ties, and vacant spaces between train station platforms and trains on the tracks both relate to open areas between two objects that could classify as either real or potential "common hazards" that Defendant generally is tasked with identifying.  *See* ECF No. 33-10.  However, gaps of up to eight and one-half inches between bridge ties (evidenced in the present case) are nowhere near comparable to the data from 1987 referenced by Plaintiff, which cites horizontal platform gaps of up to *thirty-six inches*, and vertical gaps from platform to train estimated to be up to eleven inches wide, ECF No. 33-11 at 9.

Further, Plaintiff fails to equate passenger injuries on a train station platform to injuries of professional employees upon bridge ties, particularly in that railroad employees are trained to beware gaps between timbers and are required to step across ties far more

frequently than even daily railway commuters negotiate gaps between platforms and trains. Plaintiff disregards the platform passenger's "behavior in a rushed and crowded environment as a significant factor in the risk of an incident" that does not apply to the rail worker who is not part of the rush hour crowd. *See* ECF No. 33-14 at 18.

Even when Plaintiff mentions injuries to two Metro-North employees, he fails to provide sufficient detail to suggest that Defendant had notice of its alleged negligence. Accordingly, the court has found such reference inadmissible for present consideration, *see supra* Part III (Inadmissibility of Prior Accidents), and has articulated the ways in which Plaintiff failed to equate Miguel Ayala's and Frank Venuti's accidents to Plaintiff's. Thus, even if those accidents were to be considered, they failed to put Metro-North on notice as to any claimed negligence. *See Higgins v. Metro-North R.R. Co.*, 318 F.3d 422, 427 (2d Cir. 2003) (affirming grant of summary judgment upon district court's determination that three known incidents of unwanted contact did not place Metro-North on adequate notice of employee's likelihood of sexual harassment); *cf. Ulfik v. Metro-North Commuter R.R.*, 77 F.3d 54 (2d Cir. 1996) (finding sufficient evidence for a jury to determine Metro-North had notice of a foreseeable hazard when it knew two employees had fallen ill from paint fumes before plaintiff, that same day, was exposed to and affected by the same chemical fumes).

While Metro-North certainly may have been aware of a general hazard inherently posed by gaps between bridge ties, such knowledge would have been insufficient to provide adequate notice that workers such as Plaintiff could not safely replace a bridge's guardrail under then-present working conditions. Thus, Plaintiff does not survive summary judgment where he fails to demonstrate that Metro-North knew or should have

known of a potential hazard in the workplace.  *See Gallose*, 878 F.2d at 85 ("[A]n employer is not liable if it has no reasonable way of knowing that a potential hazard exists.").

### 2. "Constant Hazard" Testimony Does Not Suggest Defendant's Failure to Demonstrate Reasonable Care

Plaintiff next cites the deposition testimony of his track supervisor, Richard Bourt ("Mr. Bourt").  Bourt Dep. 6:25–7:2, ECF No. 33-15.  Mr. Bourt acknowledged that the gaps on the Saugatuck Bridge pose a "constant hazard."  *Id.* at 93:20–94:4.  However, in labeling the gaps a "constant hazard," Mr. Bourt also noted that the gaps are "a part of the physical characteristics of the bridge."  *Id.* at 94:6–7.  Nothing in Mr. Bourt's testimony indicates that the gaps between bridge ties in the area of Plaintiff's accident were abnormal in any way, or that Metro-North somehow "failed to exercise reasonable care to inform and protect its employees" as to a known hazard.  *Coale v. Metro-N. Commuter R. Co.*, 621 F. App'x 13, 14 (2d Cir. 2015).

In *Coale*, the plaintiff fell after slipping on oily, shiny matter that had collected on the floor of a restricted railroad employee area.  *Id.*  The Second Circuit found that the spill only could have been caused by negligence, and thus that a jury should have been given the chance to determine whether the railroad breached its duty to inform and to protect its employees from unsafe working conditions about which the railroad knew or should have known.  *Id.*  Still, the Second Circuit held that FELA is not a strict liability statute, despite its relaxed negligence standard.  *Id.*

In contrast to the *Coale* scenario, Mr. Bourt testified that he "constantly" reminds his employees about the obvious, ever-present dangers in stepping over the bridge ties: "Whenever I send guys out to the bridge I remind the guys about the gaps."  Bourt Dep.

93:20–94:4.  Not only is *Coale* distinguishable because of the supervisory warnings about the dangers surrounding gaps between bridge ties, but also because the tie gaps are an ever-present characteristic of Plaintiff's job, unlike the dangerous substance that unexpectedly pooled on the floor in *Coale*.   While the unexpected and dangerous liquid in *Coale* had to have been caused by negligence, there is no claim in the present case that the gap into which Plaintiff slipped was the unexpected result of improperly-spaced bridge ties, poorly maintained tracks, or other negligent cause.   Accordingly, *Coale* can be distinguished.

Moreover, this case does not present an issue of a defect in plain view for which actual or constructive notice may be attributed to Defendant.   In *Gadsden*, the plaintiff was injured while using a handhold to pull himself up onto a high-rail vehicle, which is a road vehicle modified to operate on railroad tracks.   *Id.* at 208.   High-rail vehicles are required by the Federal Safety Appliance Act and by federal regulations to have "conveniently located" handholds or footboards.   *Id.* at 208–09.   The Second Circuit determined that a reasonable jury could have found that "the location of the handholds and footboards that are in plain view" were too high to be safe.   *Id.* at 209.   In the present case, Defendant Metro-North was not made aware of any defect in the gap where Plaintiff was injured.   There is no evidence that the gap where Plaintiff was injured, although in "plain view," constituted a "defect" by deviating from any established federal regulations, CT DOT's track design plans for the bridge, or any other industry standard, that would create a triable issue of fact for the jury. *Cf. Lindauer v. New York Central Railroad Co.*, 408 F.2d 630 (2d Cir. 1969) (finding foreseeable danger supporting evidence of

negligence when railroad's employees worked fifteen-hour shifts in twenty-degree weather).

Plaintiff's chief complaint appears to allege liability in Metro-North requiring Plaintiff to walk upon and to work upon the bridge ties, generally.  However, walking on the ties is a "daily activity" for employees such as Plaintiff.  Bourt Dep. 109:20–110:4.  The risk posed by the gaps between bridge ties is inherent in the job of a track worker.  In *Haas v. Delaware & Hudson Ry. Co.*, 282 F. App'x 84 (2d Cir. 2008), the Second Circuit affirmed a district court in granting summary judgment against a plaintiff railway employee who was injured while operating a rail switch that the plaintiff alleged was "difficult to throw," noting that the railroad was "not obligated to provide a workplace free of difficulty."  *Id.* at 88.  Indeed, "[t]he basis of [an employer's] liability is [its] *negligence*, not the fact that injuries occur."  *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543, (1994) (emphasis added); *see also Alioto v. Long Island R. Co.*, No. 16-CV-1092 (DRH) (AKT), 2018 WL 4054103, at *5 n. 3 (E.D.N.Y. Aug. 24, 2018) (finding "no merit" to plaintiff's theory that railroad was negligent by "allowing" him to walk on the unsteady surface of a ballast when that was precisely what the job required).

Likewise, courts in other jurisdictions have barred recovery under FELA where a plaintiff's injury is caused by a risk found in the normal course of the job.  *See e.g., Stevens v. Bangor & Aroostook R. Co.,* 97 F.3d 594, 598 (1st Cir. 1996) (holding that railroad employee could not recover after suitcase fell on his chest because handling luggage is "part of the work" and "[r]easonable care [under FELA] must mean reasonable in light of the normal requirements of the job."); *Parson v. CSX Transp., Inc.*, 714 F. Supp. 2d 839, 843 (N.D. Ohio 2010) (citing *Stevens* and noting that the plaintiff "may not recover

simply because of conditions encountered as part of her job requirements."); *Lewis v. CSX Transp., Inc.*, 778 F. Supp. 2d 821, 837 (S.D. Ohio 2011) (stating that plaintiff's testimony demonstrating that he had difficulty performing "the normal functions of his job" is not evidence that the job was unreasonably unsafe). Metro-North is under no obligation to provide "a workplace free of difficulty." *Haas*, 282 F. App'x at 88.  Thus, the fact that Plaintiff had to navigate across bridge ties as part of his job does not amount to a workplace danger that survives summary judgment.

### 3.   The Failure to Conduct Safety Audits Does Not Suggest Negligence

To the extent that Plaintiff claims that Metro-North is negligent because it failed to perform a safety audit of tasks performed on bridges, *see* Pl.'s Opp. at 9, the court agrees with Metro-North that "the mere existence of processes" for analyzing job hazards and safety compliance did not create any duty to audit the specific task performed by Plaintiff before the time of his accident.  Def.'s Reply at 3, ECF No. 37.  The "duty to inspect" is established when a hazard is so open, obvious, and persistent that a defendant is on constructive notice of its foreseeable danger.  *See Coale,* 621 F. App'x at 15.

In the present case, Plaintiff has established that there is some obvious element of danger inherent in the general design of railroad tracks (with spaces between ties), but he fails to evince any evidence that Metro-North had any duty to conduct a safety audit with respect to that general risk.  Plaintiff elicited testimony from Joseph Streany, Director of Field Safety Operations and Investigations at Metro-North.  *See* ECF No. 33-22.  Mr. Streany explained that Metro-North would conduct safety analyses or audits when circumstances called for them, such as upon the introduction of new machinery, tools, or technology; changes in processes or tasks; or the detection of a trend of accidents. Streany Dep. 17:17–18:22, 20:11–21:7, 23:12–13.  None of those factors applied to the

conditions or circumstances that preceded Plaintiff's tripping over the spike he had just finished tapping down, and his leg slipping between two bridge ties.  There is no record of raised spikes presenting a known tripping hazard (much less those tapped into place by the same worker who trips over them).  Additionally, Plaintiff presents no evidence that the gaps between bridge ties in the location of his accident varied as widely as the gaps between train station platforms and trains on the tracks that were exhibited in the 1987 OIG data he offers.  To the extent that he offers a report from the Federal Railroad Administration ("FRA") which determined that Metro-North has "[a]n ineffective Safety Department and poor safety culture" and "[a]n ineffective training program", Operation Deep Dive Report at 2, ECF No. 33-9, Plaintiff cites to an assessment almost four years before his accident which might be relevant to Metro-North's general safety-oriented policies and procedures, but the report's general assessment fails to show that Metro-North should have performed a safety audit specific to Plaintiff's particular work duties in which he was engaged during his accident.  More broadly, Metro-North memorandum in support of its summary judgment motion also refers to the FRA, but to note that while the agency "comprehensively regulates railroad track structure . . . [t]he FRA does not mandate any maximum distance between the edges of bridge timbers."  Def.'s Mem. of Law at 11, ECF No. 27 (referencing 49 C.F.R. Part 213).   Additionally, Plaintiff fails to present evidence of any trend of similar accidents preceding his own accident.  Thus, he raises no issue for the jury to consider with respect to Defendant's failure to conduct a safety audit related to the gaps between bridge ties.

    4. <u>The Existence of "Alternatives" that are not Demonstratively Safe is Insufficient to Suggest Negligence</u>

Finally, Plaintiff argues that Metro-North easily could have provided "temporary working/walking surfaces over gaps between railroad ties."[6]  Pl.'s Opp. at 10.  With a focus on reasonable care and on whether the record would allow any jury reasonably to conclude that Metro-North was negligent, Defendant argues that Plaintiff fails to produce "any serious alternative" to his working conditions, thereby leaving a jury to "only speculate as to whether any of the plaintiff's proposals would meet minimum engineering and safety standards."  Def. Memo at 22.

The court agrees that a safer alternative in concept might not prove to be so in actual application.  For example, Plaintiff suggests that Metro-North could have had workers such as Plaintiff erect a platform which rests on top of the timbers, thereby covering the tie gaps between the railroad tracks.  Plaintiff contemplates a platform composed of plywood sheets measuring twenty inches wide and ten feet long that workers would secure so that they could work upon a flat surface.  Pl.'s Opp. at 10; Bourt Dep. 78:22–79:21. Defendant points out that this alternative itself could present a tripping hazard, a dangerous obstruction to the employees' work, and a "pinch point" that could injure workers as they attempted to place the loose plywood before attaching it to the tracks.  Def.'s Mem. of Law at 20–21, ECF No. 27.  Indeed, a layperson might picture

---

[6]     Defendant objects to Plaintiff's evidence of safer alternatives as irrelevant.  Def.'s Stmt. at ¶ 17. The objection is overruled.  The existence of safer alternatives could be relevant to the question of whether Metro-North met its duty of reasonable care in safeguarding the workplace.  *Campbell v. Consol. Rail Corp.*, No. 1:05CV1501GTS/GJD, 2009 WL 36889, at *6 (N.D.N.Y. Jan. 6, 2009) ("[S]ince FELA requires that [a plaintiff] prove that [the defendant] failed to provide him with a safe place to work, the issue of whether or not [the defendant] could have employed a safer method of maintaining the workplace could be relevant to the issue of reasonable care.").  Of course, the mere fact that a safer alternative exists does not, by itself, establish negligence under FELA.  *Miller v. Union Pac. R.R. Co.*, 972 F.3d 979, 988 (8th Cir. 2020) ("The mere existence of alternate safer methods alone does not establish negligence under FELA."); *Ezell v. BNSF Ry. Co.,* 949 F.3d 1274, 1282 (10th Cir. 2020) (plaintiff's argument that injury could have been avoided if he was provided with an alternative method to complete the task "impermissibly expands the safe-workplace standard as requiring the safest alternative available").

Clark W. Griswold assuming that a safer alternative to traversing floor joists in an unfinished attic might be to walk across long, loose beams of wood.  *See National Lampoon's Christmas Vacation* (Warner Bros. 1989).[7]  Like stepping on the raised tines that are perpendicular to a lying rake's handle, one might imagine the plywood either being thrust toward the stepper's face, or simply sliding out from its intended place.  In any event, attaching loose plywood across bridge ties on railroad tracks might prove more dangerous than the methods used by Plaintiff to perform his work, particularly when his serious injury occurred after tripping over a spike he had just secured.

Alternatively, Plaintiff suggests that workers might slide thin pieces of steel atop the tracks and attach them to provide a flat working surface that later could be removed, *see* Pl.'s Opp. at 10; Bourt Dep. 97:10–23, but Metro-North counters that this might interfere with the work of the railway and even with the electrical rail signal system and track signals, as well.  Def. Memo at 22; Bourt Dep. 98:5–9.  Again, the court interjects to note that a layperson might find a sheet of metal to be an unwise slipping hazard, particularly in northeastern winters (complete with snow, ice, sleet, and freezing rain), and without proper drainage.  Like plywood, it also is conceivable that a thin, metallic surface might present a tripping hazard, either from walking onto a surface of a far different texture than the timbers or because such thin metal might bend, dent, or warp when rested atop timbers with gaps between them.  Just as Plaintiff tripped over the spike he had just driven down, an employee might just as easily trip over whatever Plaintiff suggests might attach the plywood or thin metal to the railroad tracks being repaired by workers, and they might then slip upon the flat metallic (or other) surface being fastened for their intended safety.

---

[7]     In pointing out what appear to be major flaws in counsel's proposed alternatives, the court in no way means to overlook or to belittle the very serious injuries to Plaintiff.

Thin metal also might pose a risk of cuts or pinching in attachment.  To the extent that Plaintiff cites to Exhibit 23 which has images of unmentioned metallic options such as one proclaiming, "Diamond safety grating with diamond-shaped openings with serrated edges provides excellent anti-slip property applied as walkways . . .", it might seem that such a design would allow the surface to drain during precipitation, but anyone believing it would be easy and safe to traverse likely missed the opportunity to cross Connecticut's former Sikorsky Bridge.  *See* Kenneth Best, *Finally, a Very Scary Bridge Is Being Replaced*, N.Y. Times, Jul. 29, 2001, Section CN, p. 14 (describing the open steel grids of the bridge that could make drivers feel as if they were losing control of their vehicles, and could cause stationary vehicles to slide several feet, such that some drivers would exit the highway to avoid that stretch of the Merritt Parkway that also lacked a proper breakdown lane).

Granted, a plaintiff need not provide expert testimony to persuasively offer safer alternatives that a defendant should have entertained in exercising reasonable care to provide a safe workplace.  Indeed, Plaintiff cites *Tufariello v. Long Island R.R. Co.*, 458 F.3d 80 (2d Cir. 2006), a case involving a railroad that was alleged to have regularly exposed its plaintiff employee to excessively loud noises without providing ear protection (as repeatedly requested by the plaintiff).  In that case, summary judgment was avoided because of the causal link between excessive noise and hearing loss.  *Id.* at 89, 92. However, the *Tufariello* plaintiff did not claim that he was denied a possible alternative of questionable effectiveness, nor the best available equipment, but that his employer failed to provide him with "reasonably safe conditions in which to work, and reasonably safe tools and equipment" to do his job.  *Id.* at 84.  In the present case, however, Metro-North is not accused of rejecting a reasonable request by Plaintiff (such as ear protection) to

avoid a known and causally-linked danger (such as excessive noise), but of essentially passing on *possible* alternatives that, as the record shows, might well have made Plaintiff's work *more* dangerous.  Thus, *Tufariello* can be distinguished, and the court finds that the alternatives suggested by Plaintiff do not evince a prima facie case that Metro-North breached its duty of care.  Plaintiff does not herein elude summary judgment.

## V.    CONCLUSION

For purposes of summary judgment, the court must consider whether Plaintiff has presented at least some evidence that the work environment, as it existed at the time of the accident, was not reasonably safe due to Metro-North's negligence.  As explained throughout this ruling, the court finds that Plaintiff has failed to present evidence of negligence that Metro-North breached its duty to exercise reasonable care in warning its workers of, and in protecting its workers from, known or foreseeable hazards or dangers. Metro-North convincingly illustrates the lack of any genuine issue of material fact upon which a jury could determine that Metro-North knew or should have known of any hazard posed by the gaps between the bridge ties on the track where Plaintiff was injured. Plaintiff presents no evidence supporting an allegation that Defendant knew in advance or should have been aware of accidents similar to Plaintiff's.  Had there been any evidence that the gaps in question were in any way defective or abnormal, the court easily would agree that summary judgment would not be warranted, but notice of an acknowledged, *potential* hazard (in working upon railroad tracks with spaced ties, generally) is not the same as a danger unreasonably overlooked (as might pertain to a particular, hazardous pair or section of ties), lest all ladders and open staircases be forced toward extinction.  Denying summary judgment in this case would mean that every single

railroad employee injured on the tracks automatically would survive summary judgment. In the present case, there is no evidence of anything inherently dangerous about the spacing of the particular bridge ties in question, though the court acknowledges that railroad work involves a certain degree of general danger.   Plaintiff raises no alleged defect or irregularity upon the bridge ties in question; no unusually long gap between ties that, as distinguished from the oily spill in *Coale*, leaves "no apparent explanation for the presence of that [hazard] except someone's negligence."   *Coale*, 621 F. App'x at 15. Plaintiff's evidence that Metro-North warned employees of certain obvious, general workplace hazards (such as to beware that railroad tracks have spaces between timbers, so that workers should be careful not to trip) does not suggest the railroad's negligence, and he fails to offer evidence suggesting that Defendant should have performed the safety audits he now demands.

Summary judgment must not be used so as to allow a district court, without sufficient justification, to deprive a potential jury (or a nonmoving party) of such a critical element of our democracy as a trial.   Nevertheless, this court cannot ignore its obligation to prevent cases from proceeding beyond summary judgment where there is no reasonable basis upon which a jury possibly could find for the plaintiff.   Sometimes a plaintiff's accident, however tragic, simply does not reasonably suggest any negligence on behalf of an employer, even when the employer points out to its employees the basic risks of the job.   This is just such a case.   "While it is true that there is a strong federal policy in favor of letting juries decide FELA cases, FELA is not an insurance program." *O'Hara v. Long Island R.R.*, 665 F.2d 8, 9 (2d Cir. 1981) (per curiam).   Plaintiff has not presented evidence of Metro-North's negligence that creates an issue of material fact to

support the denial of its summary judgment motion.  Accordingly, the motion for summary judgment properly must be granted.  Because Plaintiff's FELA claim cannot withstand summary judgment, the court need not address the parties' arguments on whether the claim is precluded by FRSA.  Metro-North's motion for summary judgment (ECF No. 25) hereby is **GRANTED.**  The clerk is instructed to render judgment for the defendant and to terminate this case.

      **IT IS SO ORDERED.**  Entered at Hartford, Connecticut, this 28th day of October, 2022.

          _____/s/_____
OMAR A. WILLIAMS
United States District Judge
